```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: December 19, 2011
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JOANNE AVELLA,                                              :

              Plaintiff,             :       09 Civ. 0923 (PAC)

  -against-                                                 :       OPINION & ORDER

VALLEY CENTRAL SCHOOL DISTRICT,                             :
DR. RICHARD HOOLEY, Superintendent
of Schools,                                                 :

              Defendants.            :
------------------------------------------------------------x

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Joanne Avella ("Avella") brings this action, pursuant to 42 U.S.C. § 1983, against defendants Valley Central School District (the "District") and the District's superintendant, Dr. Richard Hooley ("Hooley") (collectively, the "Defendants"), for an Equal Protection Clause violation. Avella served as the District's high school principal from July 1, 2008 through January 26, 2009. She claims that Defendants terminated her employment as principal for gender-based reasons.

Defendants move for summary judgment, arguing: (1) Avella has not established a prima facie case of gender discrimination; (2) Defendants had legitimate, non-discriminatory reasons for firing Avella; (3) Hooley's actions are protected by qualified immunity; and (4) Avella has not established Monell liability.

For the reasons discussed below, the Court grants Defendants' motion for summary judgment.

1

I.      FACTS[1]

Avella has been a teacher or school administrator for over twenty years.  (Pl. Aff. ¶¶ 1, 2.)  She is certified as a school administrator/supervisor and as a school district administrator, and she possesses two master's degrees, one in school administration.  (Kleinberg Decl. Exhibit (hereinafter "Ex.") I.)

In early 2008, Avella applied for the District's high school principal position.  (Def. 56.1 ¶ 28.)  After an initial round of interviews, Avella, a male candidate, and one other candidate advanced to a second round of interviews for the position.  (Def. 56.1 ¶ 35, Pl. 56.1 ¶ 35.)  Avella then had a one-on-one interview with Hooley.  (Def. 56.1 ¶ 40.)  Avella alleges that during this interview, Hooley indicated that he "was tired of the big, burley men who just do discipline" and that he "wanted somebody who was familiar with academics."  (Ex. H, 25.)  Hooley stated that he "didn't care" that Pasquale Iorlano, a Board of Education ("Board") member, "was most opposed to hiring a woman because he didn't feel that a woman would handle the discipline of a high school."[2]  (See Ex. H, 25.)  Avella did not feel her gender was an issue for Hooley.  (Def. 56.1 ¶ 49.)

Hooley recommended Avella to the Board, which voted six-to-one to hire her.  (Def. 56.1 ¶ 53; Ex. K.)  Mr. Iorlano was the sole Board member who voted against Avella.  (See Ex. K.)  Mr. Iorlano was also the sole Board member to vote against the appointment of both Ms. Voss and Mr. Antonelli as summer school co-principals at the meeting.  (See Ex. K.)  Avella was hired.

---

[1] The parties agree on the facts unless otherwise noted.
[2] Defendants' dispute that this statement was made—Hooley denies relaying the remark, and Mr. Iorlano denies making the remark.  (See Ex. B ¶ 7, Ex. G 64-65, 66.)

After Avella was hired, a hall monitor and a parent, both of whom sat on the committee that initially interviewed Avella, told her "in substance that 'the old boys' network wanted to hire a man.'"  (Avella Aff. ¶ 9.)[3]

On July 1, 2008, Avella began a probationary period of employment.  (Def. 56.1 ¶ 69.)  Around this time, Hooley suggested that Avella meet with each high school teacher on an individual basis.  (Def. 56.1 ¶ 106.)  Avella did not do so because she did not want to call the teachers in over the summer or impose on their personal time.  (Ex. H 68-72.)  Avella nonetheless approached and met several teachers during the school year.  (Ex. H 68-72.)

During Avella's first month, a high school guidance counselor filed a grievance against Avella because she assigned him to work on a project that he believed was outside of his job responsibilities.  (Def 56.1 ¶¶ 95-97; Pl. 56.1 ¶¶ 95-97.)

In September 2008, when Avella was hiring an assistant principal, Avella claims that Hooley told her "that the Board was angry enough at him as it is for hiring so many women" and "if you hire another woman I'll be in more trouble with the Board."  (Ex. H, 144.)[4]

In late October or early November 2008, Avella and her assistant principals learned of a problem involving a particular student wearing a scarf to symbolize gang affiliation.  (Pl. 56.1 ¶¶ 133-34.)  Hooley asked Avella what types of scarves were at issue.  (Def. 56.1 ¶ 141.)  Avella alleges that she and the assistant principals explained that all scarves were at issue.  (Pl. 56.1 ¶¶ 141-42.)  Hooley did not believe that Avella and the assistant principals adequately described the specific type of scarf at issue.  (Def. 56.1. ¶ 142.)  Hooley suggested Avella adopt a policy of calling students down on an individual basis and asking them to

---

[3] Defendants deny the accuracy of these statements, which have not been supported by affidavits or deposition testimony.  (Def. Reply 9.)
[4] Defendants deny that these statements were made.  (Def. Response 56.1 ¶ 17.)

remove their scarves, and punishing only those students who failed to take off the scarves when directed. (Pl. 56.1 ¶ 143.)

On November 7, 2008, an announcement banning all scarves was made over the high school intercom system. (Def. 56.1 ¶¶ 152, 153.) In response, the student body protested by wearing scarves to school and speaking out at a Board meeting. (Def. 56.1 ¶¶ 154, 156.) The protest led to news coverage. (Def. 56.1 ¶ 161.) After the protest, Hooley, having learned from a parent about the announcement banning scarves, asked Avella if an announcement had been made. (Def. 56.1 ¶ 164.) Avella had not known that an announcement had been made, and subsequently was unable to find out who made the announcement. (Def. 56.1 ¶¶ 166-168.) Avella concedes that the announcement should not have been made without her knowledge. (Pl. 56.1 ¶ 170.)

On another occasion, an assistant principal told Avella that a student who suffers from allergic reactions needed, but did not have, an Epi-Pen to go on a school field trip. (Def. 56.1 ¶ 185). Avella alleges that the student's mother told the school that her child no longer needed an Epi-Pen. (Pl. 56.1 ¶ 187.) Avella borrowed an Epi-Pen from another school, and authorized the student to go on the field trip with the borrowed medication. (Def. 56.1 ¶¶ 186-87.) Avella did not know whether it is permissible in New York to give a student an Epi-Pen that is prescribed to someone else. (Def. 56.1 ¶ 189.) An assistant principal testified that a school nurse filed a grievance concerning Avella's authorization allowing a student to go on a field trip without either an updated medical report or an Epi-Pen specifically prescribed to the student, because the nurse believed her medical expertise had been ignored. (Ex. P, 34.)

Over the course of Avella's employment, other faculty members and parents raised complaints about Avella's performance. (Def. 56.1 ¶¶ 172, 174-77, 179.) A member of the school's Education Council compared Avella's leadership, or the leadership in the school under Avella, to a "rudderless ship." (Def. 56.1 ¶¶ 109, 114 Ex. N 24-25.)[5]

In a November 14, 2008 memorandum, the deputy superintendent, Mr. Huntley, recommended to Hooley, among other things, that Avella be terminated. (Def. 56.1 ¶ 180.) Mr. Huntley stated that "there is a lack of leadership at the High School. [Avella] does not have the respect of the faculty and staff. It is questionable as to whether or not she will ever be able to establish herself there." (Ex. U.) Mr. Huntley also described ongoing problems at the high school, including that "there hasn't been a principal in the last five years who could handle the day to day functions of the school and be the educational leader." (Ex. U.)

On December 16, 2008, Hooley advised Avella, in a letter, that he would be recommending her termination to the Board on January 26, 2009. (Def. 56.1 ¶ 214.) Avella believes that Hooley sought her termination because of the scarf ban incident. (Def. 56.1 ¶¶ 218-19; Ex. H, 157-59.) She testified that Hooley's opinion of her changed after this incident, and not due to her gender. (Def. 56.1 ¶¶ 218-19; Ex. H, 157-59.)

On January 26, 2009, Avella was given an opportunity to address the Board, but she did not indicate that she her believed she was being terminated as a result of her gender. (Ex. H 192-93.) All five Board members present—three women, and two men—voted to terminate Avella's employment as principal. (Ex. DD 6.) Mr. Iorlano was absent from this meeting. (Ex. DD 1.)

---

[5] Avella claims that the "rudderless ship" comment was not directed solely at her, but was a general criticism. (Pl. 56.1¶ 115.)

5

The District hired Ms. Debra Lynker to serve as interim principal for the remainder of the 2008-2009 school year.  (Def. 56.1 ¶ 297.)  The District hired Mr. Christian Raunado to serve as full time principal for the 2009-2010 school year.  (Def. 56.1 ¶ 299.)  Mr. Raunado resigned after a year, and the District hired Ms. Jayme Ginda-Baxter, the current principal. (Def. 56.1 ¶ 301-05.)

## II. PROCEDURAL HISTORY

On February 3, 2009, Avella filed a complaint against Defendants.  She claimed, under 42 U.S.C. § 1983, that Defendants violated her right to due process and substantive due process under the equal protection clause of the Fourteenth Amendment.  On April 29, 2009, Defendants moved to dismiss Avella's due process claim.   The Court granted Defendants' motion on March 5, 2010.  Defendants now move for summary judgment on Avella's equal protection claim.

## III. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  The Court resolves all ambiguities and draws all factual inferences in favor of the non-movant, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007).

"[S]ex-based discrimination may be actionable under § 1983 as a violation of equal protection." Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006). Such disparate treatment claims are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Demoret, 451 F.3d at 149. "Under that framework, a plaintiff must satisfy the minimal burden of making out a prima facie case of discrimination; the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions; and the final burden rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual but also that the defendant discriminated against the plaintiff." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001).

## IV. ANALYSIS

Defendants argue that: (1) Avella has not established a prima facie case of gender discrimination; (2) Defendants had legitimate, non-discriminatory reasons for terminating Avella's employment; (3) Hooley should receive qualified immunity for his actions; and (4) Avella has not established Monell liability.

1. The Existence of a Prima Facie Discrimination Claim

To establish a prima facie case of gender discrimination, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the job; (3) she was subjected to an adverse employment action; and (4) that these actions were taken under circumstances giving rise to an inference of discrimination. See Gregory v. Daly, 243 F.3d 687, 695 (2d Cir.2001).

There is no dispute that Avella, as a woman, is a member of a protected class, and that she was subjected to an adverse employment action when she was fired. Defendants

argue, however, that Avella's prima facie claim fails because she was not qualified for her position and she was not terminated under circumstances giving rise to an inference of gender discrimination.

   *a. Avella's Qualifications*

To satisfy the second prong, a plaintiff need not show that her performance was "perfect or even average," but rather only make the "minimal showing" that "she 'possesses the basic skills necessary for performance of [the] job.'" Gregory, 243 F.3d at (quoting Owens v. New York City Housing Auth., 934 F.2d 405, 409 (2d Cir.1991)).

Defendants argue that, from the beginning of her employment, Avella failed to demonstrate basic competence. (Defs. Br. 5-7.) Defendants' arguments primarily concern whether Avella satisfied Defendants' expectations, rather than whether she established basic eligibility for job, and therefore are misplaced. See Slattery, 248 F.3d at 91-92 (holding that "all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer"). Accordingly, the Court defers consideration of Defendants' competency arguments until the second phase, when considering whether a legitimate non-discriminatory reason existed for firing Avella. See id.

Avella met the minimal showing for basic eligibility: she was certified as both a school administrator/supervisor and school district administrator; she had two master's degrees, one in school administration; and she had over twenty years of teaching and school administration experience, including experience as a middle school principal and high school vice principal. (See Ex I.)

### *b. Inference of Discrimination*

Defendants argue that: (1) there is no evidence that gender played a role in Avella's termination; (2) the 'same actor inference' weighs against Avella's gender discrimination claim; (3) Avella has not shown that similarly situated persons were treated less favorably; and (4) the District's practice of hiring female principals undercuts the inference that Avella was terminated due to her gender. (Def. Br. 7.)

"'[S]tereotyped remarks can certainly be evidence that gender played a part' in an adverse employment decision." Back v. Hastings on Hudson Union Free School District, 365 F.3d 107, 119 (2d Cir. 2004) (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989)). Avella argues that the District harbored stereotypical gender views, citing: (1) Hooley's statement that Mr. Iorlano was opposed to hiring women, and Mr. Iorlano's record of voting against women (see Ex. K; Ex H 25); (2) Hooley's statement that he "was tired of the big, burley men who just do discipline," from which a jury can infer that Hooley embraced the stereotypical view that men were disciplinarians and leaders (Ex. H 25); (3) two non-Board members comments about an "old boy' network wanting to hire a man" (Avella Aff. ¶ 9); and (4) Hooley's statement that "the Board was angry enough at him as it is for hiring so many women" (Ex. H 144). Defendants argue that this evidence does not create an inference that Avella was *fired* due to her gender because these statements relate to Defendants' decision to *hire* Avella. While Avella's evidence does not directly relate to the Defendants' decision to hire her, it nonetheless suggests Defendants may have held stereotypical gender views, and her burden at the prima facie stage is "minimal." See Feinerman v. T-Mobile USA, No. 08 Civ. 3517(SAS), 2010 WL 331692, at *11 (S.D.N.Y. Jan. 28, 2010)

The fact that the same actors—Hooley and the Board—both hired and fired Avella, however, weighs against an inference that Avella was fired due to her gender. "[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire. This is especially so when the firing has occurred only a short time after the hiring." Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997). Hooley recommended hiring Avella, and the Board, which is comprised of both males and females, voted six-to-one to hire Avella. (See Ex. H, 42, Ex K.) Six months later, Hooley recommended terminating Avella, and the five Board members present at the January 2009 meeting, consisting of three females and two males, unanimously agreed. (See Ex. DD, 6.) Accordingly, the same actor inference weighs against the inference that Avella was terminated based on her gender.

Avella has not shown disparate treatment—"that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee'"—which is a recognized, but not required, method of raising an inference of discrimination for purposes of making out a prima facie case. Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir.2000)); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 78 (2d Cir. 2001). "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" Ruiz v. Cnty. of Rockland, 609 F.3d 486, 492 (2d Cir. 2010) (quoting Graham, 230 F.3d at 40.)

Avella argues that she was similarly situated to Mr. Imperati, who was the District's high school principal from 2003 through 2007, and reported to the same individuals—

10

including Hooley.  (Avella Opp. 11 & n.4.)  While generally, a probationary employee is not similarly situated to a non-probationary employee, "a court is not precluded from inferring a discriminatory motive if an employer severely disciplines a probationary employee for an offense for which a non-probationary employee is not disciplined 'at all' . . . ." Jones v. Yonkers Public Sch., 326 F.Supp.2d 536, 545-546 (S.D.N.Y. 2004) (citing Feingold v. State of New York, 366 F.3d 138, 153-54 (2d Cir.2004)).

Avella argues that she was terminated for conduct that is of comparable seriousness to that which Mr. Imperati engaged in and for which he was not disciplined.  Avella cites Mr. Huntley's November 2008 memorandum, which stated "there hasn't been a principal in the last five years who could handle the day to day functions of the [high] school and be the educational leader" (Ex. U); and Hooley's testimony that he receive some complaints about "some slippage in [Mr. Imperati's] work" during the course of his employment, but "not much," and that after Mr. Imperati left, there were complaints that he "was unable to separate his leadership from his personal relationships," was "wishy-washy," and "made promises he did not deliver."  (Ex. D 186-87.)  These complaints are comparable to the complaints that Avella lacked leadership.

Avella believes, however, that Hooley recommended firing her over the scarf ban incident and she has not shown that Mr. Imperati engaged in conduct comparable to her failure to know about and control an announcement regarding a school-wide policy. Graham, 230 F.3d at 40.  Accordingly, Avella has not shown disparate treatment.

Finally, the District's decision to replace Avella with a female principal, and to hire a female as the current principal, "strongly discounts any inference of discriminatory animus on the basis of Plaintiff's [gender]."  Noble v. Career Educ. Corp., No. 07-CV-5832 (KMK),

11

2009 WL 2391864, at *9-10 (S.D.N.Y. Aug. 4, 2009). Over the course of three years, three of the four principals hired by the District were female, which strongly discounts any inference of discriminatory animus on Defendants' behalf.

In sum, Avella has presented some evidence of discriminatory animus. She has not, however, shown disparate treatment and cannot rebut the same actor inference and the Defendants' pattern of hiring women, which weighs against any inference that Avella was fired due to her gender. Since Avella's burden at this phase is minimal, the Court will afford her every favorable inference and assume that she has met the burden of establishing a prima facie claim. See Feinerman, 2010 WL 331692, at *11 (finding that while evidence of gender discrimination was "scant," when viewed together, it satisfied plaintiff's "minimal" burden of showing circumstances giving rise to an inference of discrimination to establish a prima facie case.)

      2. Legitimate, Non-Discriminatory Performance Based Reasons for Termination

"After a plaintiff demonstrates a prima facie case of [gender] discrimination, the defendant must produce evidence 'which, *taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.'" Carlton v. Mystic Transp., Inc., 202 F.3d 129, 136 (2d Cir. 2000) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993) (emphasis in original)). The explanation "must be 'clear and specific.'" Id. (citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1226 (2d Cir.1994)).

Defendants argue, inter alia, that they terminated Avella due to problems with her leadership, and overall basic competence.

With respect to Avella's leadership, there is no question that numerous individuals, who are not defendants here, complained about Avella's performance as principal. A

12

guidance counselor filed a grievance concerning an assignment he received from Avella. (Def 56.1 ¶¶ 95-97; Pl. 56.1 ¶¶ 95-97.) A department supervisor compared Avella's leadership—or the leadership under her tenure—to a "rudderless ship." (Pl. Response 56.1. ¶ 115.) Other faculty members and parents raised complaints about Avella's performance. (Def. 56.1 ¶¶ 172, 174-77, 179.) The deputy superintendent, stated that "there is a lack of leadership at the High School. [Avella] does not have the respect of the faculty and staff. It is questionable as to whether or not she will ever be able to establish herself there." (Ex. U.) While the deputy superintendent acknowledges that problems existed at the high school before Avella started, he stated that "[w]hatever is done or not done this year will impact next year and lead to another year of confusion, disarray, and stalled initiatives." (Ex. U.) He recommended firing Avella. (Ex. U.) The record is barren of any positive evaluations of Avella's performance.

The scarf ban incident reflected poorly on Avella's competence. Avella learned of a problem "that a particular student was using a scarf to symbolize gang affiliation." (Pl. 56.1 ¶¶ 133-34.) When Hooley asked what kind of scarf was at issue, Avella—despite the fact that the issue involved one particular student—indicated that all scarves were a problem. (Pl. 56.1 ¶¶ 141.) Hooley recommended addressing students who wore scarves on an individual basis, but instead a school-wide announcement banning all scarves was made. (Pl. 56.1 ¶ 143; Def. 56.1 ¶¶ 152, 153.) This announcement led to a student protest, and news coverage. (Def. 56.1 ¶¶ 154, 156, 161.) Avella, however, did not even know that any announcement had been made until Hooley inquired about it, and afterwards, she was not able to find out who made the announcement and when. (Def. 56.1 ¶¶ 166-168.) She concedes that the announcement should not have been made without her knowledge. (Ex. H 163.)

Other events also reflected poorly on Avella's competence.  For example, Avella did not know whether it was permissible in New York to give a student an Epi-Pen that was prescribed to someone else, but did so anyway.  (Def. 56.1 ¶¶ 186-87.)  Hooley asked Avella to meet with each high school teacher on an individual basis, but she decided not to so.  (Def. 56.1 ¶ 106; Ex. H 68-72.)

These undisputed facts present legitimate, non-discriminatory reasons for Defendants' termination of Avella's employment as principal.

3. Whether Defendants' Reasons are Pretextual

Avella argues that Defendants' reasons are pretextual because she was able to "rebut each individual incident" and the "amalgamation of numerous events," cannot properly justify dismissal. (Pl. Opp. 22.)

For the most part, Avella admits that these 'incidents' happened—e.g., the scarf ban, the Epi-Pen incident, and the complaints about her performance.  While she attempts to explain these incidents—i.e. that she did not know an announcement was made and whether she could give a student medicine prescribed to another, and that the "rudderless ship" comment was not directed solely at her—she has failed to show that Hooley and the District's decision to hold her accountable for these incidents, and fire her because of them had anything to do with her gender.

As discussed above, Avella's evidence of gender discrimination was only assumed to state a prima facie claim, notwithstanding her failure to rebut the same actor inference, and the District's pattern of hiring women, which weighs strongly against an inference that Defendants acted with discriminatory animus.  Avella's evidence is insufficient to satisfy her burden at this third stage and overcome a record replete with legitimate, non-discriminatory

14

reasons for firing her. Since Avella has not shown that Defendants' legitimate, non-discriminatory reasons for terminating her were pretextual, Defendants' motion for summary judgment is granted. Accordingly, the Court need not consider parties' arguments concerning qualified immunity or Monell liability.

## CONCLUSION

For the foregoing reasons, the Court GRANTS summary judgment for Defendants. The Clerk of Court is directed to enter judgment for Defendants and close this case.

Dated: New York, New York
       December 19, 2011

SO ORDERED

*Paul A. Crotty*

PAUL A. CROTTY
United States District Judge

15